THOMAS T. KENNEY ᴇᴛ ᴀʟ. *v.* GEORGE L. MORGAN
ᴇᴛ ᴀʟ.

[No. 966, September Term, 1973.]

*Decided September 20, 1974.*

The cause was argued before POWERS, GILBERT and MENCHINE, JJ.

*James C. Cawood, Jr.,* for appellants.

*Jerome T. May* for appellees.

MENCHINE, J., delivered the opinion of the Court.

George L. Morgan, Jr. and Edwina C. Morgan, his wife, (Morgans) are the owners, by virtue of a deed in fee simple, of a lot and dwelling in a development in Anne Arundel County known as "Turnbull Estates." Their title was acquired from Thomas T. Kenney and Margaret B. Kenney, his wife, (Kenneys) who reside in that development but are also its developers and the owners of more than 100 unsold,

unimproved lots within it. The Morgans, acting for themselves and on behalf of 13 of 17 residents of Turnbull Estates, filed a bill for declaratory judgment and injunctive relief against the Kenneys and others in the Circuit Court for Anne Arundel County. Prior to the actual development of Turnbull Estates, the Kenneys had recorded among the land records of Anne Arundel County a declaration of covenants and restrictions to be applicable to all lots within the development. All subsequent lot sales were made subject to that declaration. The bill sought: (a) to have those covenants and restrictions declared to be illegal and unenforceable; and (b) to have the bylaws of the Turnbull Homes Association, Inc. (a corporation to be formed under provisions of the recorded declaration) declared to be void, with required adoption of new bylaws under voting procedures to be fixed by court decree.

Although the bill of complaint attacked the entirety of the covenants and restrictions contained in the recorded declaration, the Morgans limited their evidential attack to only a few of them. As a result, the decree of the trial court dealt with less than all of those covenants and restrictions. Moreover, the appellants in their brief stated that they did not contest such parts of the decree as related: (a) to covenant M; (b) to an accounting of funds; and (c) to the required transfer of title to certain recreational areas within the development. We shall accordingly limit our review to a consideration of those parts of the decree that dealt with (a) the validity and interpretation of covenants C, J, K, L and N; and (b) the bylaws of the Turnbull Homes Association, Inc.

## The Covenants

We will set forth only those covenants, together with such parts of the recorded document as are essential to their interpretation or reflect upon their intended effect. So edited, the recorded document would read as follows:

"THIS DECLARATION, made this 30th day of September in the year Nineteen Hundred and Fifty-nine (1959), by THOMAS T. KENNEY and

MARGARET B. KENNEY, his wife, of the County of Anne Arundel, State of Maryland.

\* \* \*

"AND WHEREAS, The Developers have subdivided certain portions of said tract of land into residential building sites or lots for sale to the public as such, which said lots are hereinafter more particularly described, SUBJECT, HOWEVER, to certain conditions, restrictions, covenants, reservations, easements, liens and charges, all as hereinafter specifically set forth, which are to run with the land and to be binding alike upon The Developers and all purchasers, their successors, assigns, heirs, executors and administrators;

\* \* \*

## Definition of Terms

" 'Building Site' shall mean any lot, or any portion thereof, or any two or more contiguous lots, or a parcel of land of record and in unity of title, upon which a dwelling may be erected in conformance with the Covenants herein.

" 'Association' shall mean a non-profit, non-stock association or corporation to be organized under the laws of the State of Maryland by the property owners of lots as shown on the Plat aforesaid, or upon any further Plats of Turnbull Estates, in the tract of land hereinbefore mentioned or adjacent thereto, to be known as The Turnbull Homes Association.

" 'The Turnbull Company' shall mean a business firm, or a corporation to be organized under the laws of the State of Maryland by The Developers with full corporate powers as set forth in its charter, including specifically the power to develop the tract of land aforementioned, or any extensions thereof, known or to be known as Turnbull Estates, or any portion thereof.

\* \* \*

*General Purpose of Conditions*

"The aforesaid enumerated lots as shown on said Plat of 'Part of Section 1, TURNBULL ESTATES' are subjected to the following Covenants, to insure the best use and the most appropriate development and improvement of each building site thereof; to protect the owners of building sites against such improper use of surrounding building sites as will depreciate the value of their property; to preserve, so far as practicable, the natural beauty of said property and neighborhood, to guard against the erection thereon of poorly designed or proportioned structures, and structures built of improper or unsuitable materials; to obtain harmonious color schemes; to insure the highest and best development of said property; to encourage and secure the erection of attractive homes thereon, with appropriate locations thereof on building sites; to prevent haphazard and inharmonious improvement of building sites; to secure and maintain proper setbacks from streets, and adequate free spaces between structures; and in general to provide for a high type of home ownership in said subdivision and thereby stabilize the investment in homes and secure to the owners thereof the better type of environment for family living.

*Covenants*

* * *

"B. No building, fence, bulkhead, dock, shore improvements or excavations shall be erected, placed, or made on any building site or on contiguous waters thereto until the building plans, specifications, plot plan showing the type and location of such building or other work have been approved in writing as to material and construction, grade, elevation and conformity and harmony of external design with existing

structures in the development, by The Turnbull Company.

"C. No building shall be located on any Building Site less than Fifty Feet from the front lot line for all sites covered by these Covenants, nor less than Twenty-five Feet from any side street line. No building shall be located less than Ten Feet from any side lot line. The Turnbull Company may waive minor violations of these provisions.

\* \* \*

"J. None of the property subject to this Declaration shall be occupied, leased, demised, rented, conveyed or otherwise alienated, except by way of a Mortgage or Deed of Trust and sale for default thereunder, nor shall the title or possession thereof be transferred, without the consent in writing had and obtained from The Turnbull Company, except that The Turnbull Company may not withhold such consent, if written request has been made to it to permit such occupation, leasing, renting, conveying, or alienation, signed by a majority of the owners of the lots which are subject to this Declaration, and which adjoin or face said lot upon both sides of the street, or streets, and within a distance of five lots from the side lines thereof.

"K. In order to facilitate operation of Covenant J above, the owners of property subject to this Declaration covenant for themselves, their heirs and assigns, that in the event at any time they shall desire to lease, rent or sell said property they will appoint The Turnbull Company agent for such purpose.

"L. No fence, wall, hedge, or mass planting shall be permitted to extend beyond the minimum building setback line established herein except upon approval as provided in Covenant B above.

\* \* \*

"N. The owner of each Building Site shall be entitled to one membership in The Association and to participate in all of the affairs of the Association in accordance with the By-laws of the Association. Each Building Site, from the date of its purchase from The Developers, shall be subject to the payment of an annual charge of Eighteen ($18.00) Dollars, which shall be payable to the Association on the first day of January of each year and shall be applied as dues for said membership. Said annual charge due the first day of January of each year, if not paid on or before the first day of March of that year, shall bear interest from said last-mentioned date at the rate of six per centum per annum.

"O. These Covenants are to run with the land and shall be binding on all parties and all persons claiming under The Developers until January 1, 1980, at which time said Covenants shall be automatically extended for successive periods of Ten (10) years unless by a two-thirds vote of the then owners of the Building Sites covered by these Covenants it is agreed to change said Covenants in whole or in part.

\* \* \*

"Q. The Turnbull Company shall have the right to assign to the Association, in whole or in part, its rights, duties, powers and functions under this Declaration."

### Covenants J and K

Covenant J imposed a restriction upon alienation. The limitation imposed by Covenant K conjunctively was attached to that restriction. Accordingly the two covenants will stand or fall together. The trial court concluded, properly we think, that covenants J and K imposed unlawful restrictions repugnant to the inherent nature and quality of a fee simple estate. The language of the covenants is

strikingly similar to those struck down in *Real Estate Co. v. Serio,* 156 Md. 229. In *Serio* it was said at pages 234-35:

"The restriction imposed by the deed of the Northwest Real Estate Company upon sales by its grantees and their successors was clearly repugnant to the fee simple title which the deed conveyed. Its object was to deprive the grantees, until 1932, of the unrestrained power of alienation incident to the absolute ownership which the granting clause created. In *Clark v. Clark, supra,* the attempted restraint was for a period of ten years, and consisted of a requirement for consent by six other devisees, while here it is for a shorter period and the consent of a single but corporate grantor is the condition of a transfer. But in each instance the intended interference with the normal alienability of the fee simple estate devised or granted is equally apparent. As stated in *Tiffany on the Law of Real Property* (2nd Ed.) p. 2311, 'The fact that a restriction upon the right to alienate a vested estate in fee simple is to endure for a limited time only does not, by the weight of authority, render the restriction valid.' In addition to the cases cited by the author in support of that statement are a number collected in a note to *Latimer v. Waddell,* 119 N. C. 370, as reported in 3 *L. R. A.* (N. S.) 668. In *Murray v. Green,* 64 Cal. 367, it was said: 'It is difficult to conceive of a condition more clearly repugnant to the interest created by the grant of an estate in fee simple than the condition that the grantees shall not alienate the same without the consent of the grantor. With such a condition, if valid, annexed to the grant, it would be neither a fee simple nor any other estate known to the law.'

"In practical effect the reservation in the deed before us would give the grantor company unqualified control for a term of years over the disposition of the property by sale or lease. The recital that the purpose of the restriction is to

maintain 'a desirable high class residential section' and to enable the grantor 'to pass upon the character desirability and other qualifications of the proposed purchaser or occupant' was evidently designed to explain rather than to limit the reservation of the power to forbid a transfer of the property by the grantees to any purchaser or lessee who failed to conform, in the opinion of the grantor's officers, to those indefinite standards. The existence of such a discretionary control would be plainly incompatible with the freedom of alienation which is one of the characteristic incidents of a fee simple title."

Covenants J and K properly were declared to be invalid by the decree of the trial court.

### Covenant C

This covenant reads as follows:

"No building shall be located on any Building Site less than Fifty Feet from the front lot line for all sites covered by these Covenants, nor less than Twenty-five Feet from any side street line. No building shall be located less than Ten Feet from any side lot line. *The Turnbull Company may waive minor violations of these provisions.*"

The decree of the trial court struck down the italicized portion of covenant C. We find no invalidity in the provision.

Appellees suggest that the Turnbull Company is a non-existent entity. The record shows that the Kenneys functioned under the firm name of The Turnbull Company. The recorded document plainly authorized them to do so.

The right of a developer of property to retain a power to waive restrictions is clearly recognized in this State. In *Matthews v. Kernewood, Inc.*, 184 Md. 297, it was said at page 307:

"One who conveys a part of a tract of land by deed containing restrictive covenants may reserve to

himself the power to modify or omit these restrictions altogether as was done in the case at bar."

There is not a scintilla of evidence to demonstrate any arbitrary or capricious abuse of the reserved power. In *Jones v. Real Estate Co.*, 149 Md. 271, it was said at pages 280-81:

"There is some discussion in the brief of the appellants as to whether the provision in the tenth covenant, giving the appellee the right to waive many, if not all, of the restrictions in any particular case, does not destroy the theory of a general plan of development, and render the covenants unenforceable on the ground of lack of mutuality. We would have to consider this in a suit brought by one lot owner against another, but we do not consider it necessary to pass upon it in this suit, because we are here dealing with an original grantor, who still owns a considerable part of the land, and the assignees of an original purchaser, and, as the deed specifically states that the covenants are to bind 'the grantees, their heirs and assigns,' there would seem to be no question, under the authorities, of the grantor's right to enforce the covenants, if they are otherwise valid."

### Covenant L

This covenant reads as follows:

"No fence, wall, hedge, or mass planting shall be permitted to extend beyond the minimum building setback line established herein *except upon approval as provided in Covenant B above.*"

The italicized words in this covenant were found by the trial court to be invalid. We find no invalidity.

The right of a developer to reserve a power to approve or disapprove designs for proposed buildings was recognized in the early case of *Peabody Heights Co. v. Willson*, 82 Md. 186, 203. In *Jones, supra,* a general restriction against

construction of a building or fence, except after approval by the developer, was held valid. Although *Jones* did not deal specifically with the construction of a fence, or hedge, or mass planting, it did declare at pages 278-79:

"We have no doubt as to the validity of the provisions authorizing the appellee to withhold its approval if the use, shape, height, materials, location and approximate cost of the structure and the grading plan of the lot did not reasonably conform to the general plan of development, and to refuse to approve the plans for buildings which would be out of harmony in any of the particulars mentioned with other structures in the addition, or which would interfere unreasonably with the outlook from other structures in the vicinity."

Restrictions specifically dealing with fences and plantings have been sustained as valid in other jurisdictions. See *Davis v. Huguenor*, 97 N.E.2d 295 (S. Ct. Ill. 1951); Annotation 23 A.L.R.2d 937.

The principle stated in *Peabody Heights Co.* and *Jones*, both supra, was reaffirmed in *Kirkley v. Seipelt*, 212 Md. 127, where, in dealing with a covenant requiring developer approval of plans, it was said at page 133:

"There can be no question as to the intention of the parties in the case at bar. The language used in the covenants, partly quoted above, makes plain the desire to regulate the construction of the dwellings in such a manner as to create an attractive and desirable neighborhood. We think the parties had a right voluntarily to make this kind of a contract between themselves; and the covenant does not create any interference with the fee of the property that would require it to be stricken down as against public policy. It does not prevent the owner from conveying the property or impose any unlawful restraint of trade, but affects only its method of use. We hold that any refusal to approve the

external design or location by the Rodgers Forge Realty Corp. would have to be based upon a reason that bears some relation to the other buildings or the general plan of development; and this refusal would have to be a reasonable determination made in good faith, and not high-handed, whimsical or captious in manner."

The subject covenant L, examined in the light of the principles declared in the cited decisions, upon its face is within reasonable limits. There is no showing in this record that the restriction has been applied unevenly or that its provisions were arbitrarily or capriciously enforced.

### Covenant N

This covenant reads as follows:

"The owner of each Building Site shall be entitled to one membership in The Association and to participate in all of the affairs of the Association in accordance with the By-laws of the Association. *Each Building Site*, from the date of its purchase from The Developers, *shall be subject to the payment of an annual charge of Eighteen ($18.00) Dollars*, which shall be payable to the Association on the first day of January of each year and shall be applied as dues for said membership. Said annual charge due the first day of January of each year, if not paid on or before the first day of March of that year, shall bear interest from said last-mentioned date at the rate of six per centum per annum. (Emphasis added.)

It will be observed that this covenant incorporates by reference those sections of the declaration wherein "Building Site" and "Association" had been defined as follows:

" 'Building Site' shall mean any lot, or any portion thereof, or any two or more contiguous lots, or a parcel of land of record and in unity of title, *upon which a dwelling may be erected* in

conformance with the Covenants herein. (Emphasis added.)

" 'Association' shall mean a non-profit, non-stock association or corporation to be organized under the laws of the State of Maryland by the property owners of lots as shown on the Plat aforesaid, or upon any further Plats of Turnbull Estates, in the tract of land hereinbefore mentioned or adjacent thereto, to be known as The Turnbull *Homes* Association." (Emphasis added.)

A non-profit, non-stock corporation known as Turnbull Estates Homes Association, Inc. (The Association) was formed in conformity with the provisions of the recorded declaration.[1]

The dispute between the Kenneys and the Morgans with respect to covenant N has been restricted to its interpretation. Its alleged invalidity was not pressed at trial. The Kenneys contend that the covenant operates to grant to them, as owners of more than one hundred unsold and undeveloped lots, one vote in The Association for each such lot. The Morgans contend that voting membership in The Association is limited to those residents of the development (currently 17 in number including the Kenneys) who are the owners of a building site upon which a dwelling has been erected.

The decree of the trial court thus resolved this dispute:

"B. Covenant N is interpreted as meaning that the owner of each building site purchased from the developers is entitled to one membership in "The Association". More specifically, Thomas T. Kenney

---

1. The corporate charter is not violative of any provision of the recorded declaration and affords no conflict with the deed of the Morgans. The decree of the trial court determined, *inter alia*, that: "The Turnbull Homes Association, Inc., is a duly incorporated, legal entity but all actions taken by said Corporation subsequent to its formation are declared void." Neither appellants nor appellees question the finding that a *de jure* corporation exists. The dispute between them as to The Turnbull Homes Association, Inc. is limited exclusively to the validity of the Corporation's bylaws, an issue that subsequently will be considered in this opinion.

and Margaret B. Kenney, his wife, are not entitled to a membership for each lot that they own. The Eighteen Dollar ($18.00) annual charge recited in Covenant N attaches to each building site as of the day it is sold by the developers and the money goes to the "Association" as opposed to the developer and/or Thomas T. Kenney and Margaret B. Kenney, his wife."

In *Satine v. Koier*, 223 Md. 417, it was said at page 420:

"* * * parties to a contract will not be allowed to place their own interpretation on what it means or was intended to mean. The test is what a reasonable person in the position of the parties would have thought it meant."

Inclusion of the defined words "Building Site" and "Association" within the language of covenant N would reasonably indicate to purchasers from the Kenneys: (a) that each such purchaser would thereby become a member of an association formed or to be formed for their benefit; and (b) that the annual charge of $18.00 required to be paid by each such member would be utilized by that association under voting procedures granting to each resident in the development a single vote.

The record shows that the Kenneys paid only one annual charge for each of the years since formation of the corporation. This course of action by them is inconsistent with their present contention. A contractual interpretation given by parties by their acts and conduct may be considered in cases where ambiguity exists, *Cadem v. Nanna*, 243 Md. 536.

The name chosen for the corporation in the recorded declaration, namely, "The Turnbull *Homes* Association" (emphasis added) lends added weight in persuasion that the corporation proposed to be formed was intended as a vehicle to benefit the resident home owners, rather than the developer or other lot owners.

Similarly, the use of the words "upon which a dwelling

may be erected" in the definition of "Building Site" within the recorded declaration strengthens the conclusion that proper interpretation of the covenant is that made by the trial judge. The use of the word "may" in the document adds further persuasion. Although the word has a variety of meanings, one of them given in the American Heritage Dictionary of the English Language (1973) defines the word to mean "obligation or function, with the force of *must* or *shall* in statutes, deeds and other legal documents."

The interpretation of covenant N was correct. The covenant will be construed most strongly against the Kenneys, who prepared it. *Kelley Construction Co. v. Sanitary Commission*, 247 Md. 241, 250. We shall affirm that part of the trial court's decree.

### *Bylaws of the Association*

Although, as previously stated, the trial court found that Association to be a *de jure* corporation created in accordance with the recorded declaration, its decree in effect struck down the bylaws of that corporation in their entirety. For reasons hereafter stated we find only Article 3 of the bylaws, relating to voting rights of members of The Association to be invalid, with all other Articles thereof validly adopted and presently subsisting.

In 18 Am.Jur.2d, Corporation, § 166 it is said, "* * * where a bylaw consists of several distinct and independent parts, though one or more of them is void the rest are valid."

The record shows that the bylaws of The Association were adopted by the directors named in the corporate charter. The right to do so is plainly authorized by statute. Article 23, §§ 55, 132 (b). No action has been taken to repeal or amend them. The exercise of the power thus conferred is not unlimited. The provisions of corporate bylaws must be consistent with law. Article 23, §§ 9 and 48.

Article 3 of the corporate bylaws reads as follows:

"ARTICLE 3 — Voting Rights:

Section 1 — In all matters which shall come before

the members of this Corporation, and in all corporate matters, the voting power of the members of this Corporation shall be unequal, according to the following rules:

(a) — Except as provided in (d) of this Section, each member of this Corporation shall have at least one vote.

(b) — Except as provided in (d) of this section, each member of this Corporation owning of record one or more building sites shall have the right to the number of votes equal to the total number of building sites of which he is the owner of record.

(c) — Except as provided in (d) of this section, each purchaser who is a resident on a building site and is purchasing it under a contract or agreement of purchase shall be entitled to one vote.

(d) — When a building site is owned of record in joint tenancy or tenancy in common, or when two or more residents are purchasing a building site under a contract or agreement of purchase and residing thereon, the several owners or purchasers of said building site shall collectively be entitled to one vote only therefor.

(e) — Voting rights may be exercised only when all dues and obligations set out in the Protective Covenants and By-Laws have been complied with in full."

In Fletcher Cyclopedia Corporations, Permanent Edition (1966) § 4188, it is said:

"It is settled law that a corporation has no power to adopt bylaws which impair or destroy the obligations of contracts or rights thereunder or vested rights, and that bylaws which have that effect are invalid and unenforceable against a

714

person whose rights are impaired or destroyed thereby."

Article 3 of the subject bylaws would destroy the vested right of the appellees to a voice of equal strength to other persons similarly situated in the management of The Association granted in the recorded declaration. This could not lawfully be done.

> *Decree affirmed in part and reversed in part and cause remanded for the passage of a decree not inconsistent with this opinion.*
>
> *The costs to be equally divided between appellants and appellees.*